ALVARADO W. CRAIG, ADMINISTRATOR, APPELLEE, v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILROAD COMPANY ET AL., APPELLANTS.

FILED DECEMBER 18, 1914.   No. 17,877.

1. **Railroads:** GRADE CROSSINGS: CARE REQUIRED. At highway crossings at the same grade as the railroad, and at like street crossings in cities or villages, a railroad company must. use such care and precaution as ordinary prudence indicates to avoid injury to travelers, and the degree of care which the law requires to be exercised must be commensurate with the probability of danger.

2. **Trial:** QUESTIONS OF LAW AND FACT. Where different minds may draw different inferences or conclusions from the facts proved, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury to determine; but, where the evidence is undisputed, and but one reasonable inference can be drawn from the facts, the question is one of law for the court.

APPEAL from the district court for Douglas county: WILLIS G. SEARS, JUDGE. *Reversed.*

*Brome & Brome, James B. Sheean* and *George W. Peterson,* for appellants.

*Sullivan & Rait* and. *W. T. Thompson, contra.*

LETTON, J.

Plaintiff's intestate was killed while driving over a railroad crossing in the village of Lyons. This action is for damages for the wrongful death of the deceased.

In substance, the petition alleges that there is a mill and elevator to the west of the railroad track in Lyons, Nebraska, near Main street; that a large number of teams

are constantly passing to and fro over the railroad crossing at that point; that on the 11th day of May, 1911, the plaintiff's son, Zell Craig, a young man about 18 years of age, and Catherine Craig, plaintiff's wife, while driving from the mill across the track, were struck and killed by a passenger train, of which defendant Murphy was the engineer; that the view was obstructed by buildings and erections close to the track, and there was no flagman stationed or signs given at the crossing. The negligence charged is that the defendant ran the train at a high, dangerous and unusual rate of speed, failure to ring a bell or blow the whistle when the train was at least 80 rods from the crossing, and to keep the same ringing or whistling until the crossing was passed, and the failure to stop the train after defendant railroad's servants knew that the team was upon the crossing.

The answer denies negligence, and pleads contributory negligence. It also pleads by way of counterclaim that, by the carelessness of the Craigs, the train was derailed and damages inflicted to the track, the cars and the engine in the sum of $1,015. A similar answer was filed by the engineer of the train, except that in his counter-claim he alleges personal injuries to himself caused by the derailment. Plaintiff had judgment against both defendants for $7,000, and defendants appeal.

The undisputed facts or those clearly proved will first be stated, and the testimony as to other material matters, narrated, omitting matter covered by the general statement.

Lyons is a village with a population of about 1,000 people. Main street, shown upon the accompanying plat, is the business street of the town, and the larger part of the business is transacted in the two blocks immediately east of the railroad crossing. The railroad station is 1,480 feet south of the crossing, and there is a slight upgrade from the crossing to the station. From 150 to 400 people cross the tracks at this crossing every day; a large number of them going to the mill, elevator and other buildings to the west of the track. A continuation of the street is also

the main highway to the well-settled farming country ly-
ing to the west of town. The mill and elevator are sepa-
rated by a distance of from 20 to 23 feet, and this is nar-
rowed by a platform on the side of the mill, used for load-

ing and unloading and for access to the building. Both
the mill and elevator are operated by water power from
the Logan river; the dam being close to the mill. There
is a direct conflict in the testimony as to whether a box
car was standing on the sidetrack near the south end of

the elevator, but the jury evidently found that the car was there and obstructed the view. From the center of the main line to the center of the side-track at the crossing is 14 feet, 10 inches. The ground slopes upward slightly from the driveway between the mill and elevator to the railway. Parties desiring to load or unload at the mill would drive north between the mill and elevator, but in order to return were compelled to drive beyond the mill and make a sharp turn, coming back through the driveway by which they entered. There is a sharp curve in the railroad north of the elevator, so that looking north from the mill platform, and from the turning place still further north, a view of the railroad can be had extending to the northwest for more than half a mile, and the view of the track from immediately west of the crossing is cut off by the elevator. There is a dam with an eight-foot fall close by the mill on the west, and this and the machinery of the mill made the locality of the driveway more or less noisy. On the morning of the accident Zell Craig, accompanied by his mother, Catherine Craig, drove to the mill with a grist, unloaded it upon the platform, drove north to the turn, and came back through the driveway. There was a strong wind blowing, but there is a conflict as to whether it was from the north or south. There is testimony that one of the horses that Craig was driving was a broncho which was not well broken, but this we think is not material, since there is no proof of fractious or unruly conduct on the part of this animal at this time. The estimates as to the speed of the train vary from 25 to 35 miles an hour, but we are satisfied from the proofs that it was running at least at the rate of 30 miles as it approached the crossing. The proof is that the statutory signals were given, and the court so instructed the jury.

The testimony on behalf of plaintiff as to other material facts is substantially as follows: One witness, who was in the blacksmith shop in the center of the block east of the crossing, on the north side of the street, said that he heard the train whistle for the crossing and afterwards,

give a danger whistle before the team was struck, and that
he did not see the team or wagon until after the collision.

The next witness was the plaintiff, who testified as to
local surroundings, the age of his son, and his ability to
labor.   He also gave facts as to the other members of his
family and the pecuniary loss sustained by the death.  The
third witness, who stood at the door of the blacksmith
shop, testified that he saw the team come up over the rail-
road, and saw the wagon cut in two by the train; that at
the time the team was being driven over the crossing it
was "just coming over in a little trot."

On the part of the defendants, the miller, who helped
Craig to unload the grist, testified that while he was on
the mill platform, and after Craig had started the team
north in order to turn, he heard the train coming south,
whistle at the Logan bridge (which is half a mile north),
and afterwards heard it whistle again for the crossing;
that Craig turned and drove back between the mill and
elevator with the team walking; that after he passed the
mill, and just after he began to make the turn to the cross-
ing, he used his whip on the horses, and continued to use it
until he was struck by the engine.   He also testified that
there were no obstructions to the view north of the mill
from the turn except a little clump of trees half way be-
tween the Logan bridge and the trestle bridge near the
whistling post.

One Behn, who was driving a team for the mill-owner,
was leaving the mill for the crossing just as Craig drove
into the driveway.   The witness drove his team to a point
about 30 feet west of the side-track, when he heard the
whistle and stopped.   He waited for the train to pass.
He testified that he saw Craig start to whip his horses as
he turned to go up to the crossing; the horses were trotting;
that he saw him look to the north as he went up the grade
onto the crossing at about the switch track.   The witness
shouted as loudly as he could to him to stop as he passed
him.   Craig was then about 8 or 10 feet away from him.
He did not see the train until it was east of the elevator.

Mr. Lyons, proprietor of the mill, was in the mill near an open window in the southeast corner. He testifies that he saw the team as it came south of the mill. As it approached the crossing Craig drove faster. He turned his head to the north as he cleared the side track, and as he turned back he applied the whip. He says, "the woman made a grab for his arm or the lines," and the horses passed onto the main line on a gallop. The team passed the engine, and it struck the wagon. There was no box car beside the elevator. Cross-examination: He first saw the train south of the elevator, and the whipping when Craig was going upon the switch track about 25 or 30 feet from the main line.

The engineer of the train testified that the bell was ringing continuously between the whistling post and the crossing; that he saw the team and wagon on the track when he was about 100 feet away and immediately applied the emergency air.

Another witness, the postmaster, who was 50 feet east and 60 or 70 feet south of the crossing, testified that he did not see the team until it was practically right upon the side track. Craig then was urging and whipping the horses and they were on a gallop.

The fireman testified that he rang the bell continuously from the whistling post until they reached the crossing, and that the train was going about 30 miles an hour.

Another witness was unloading garbage into the river southwest of the mill and about 100 feet west of the crossing. His attention was attracted by the manner in which Craig was driving past him toward the crossing; that he was whipping the horses and urging them on, driving right by the heads of the team of the witness. Witness heard the train when it whistled for the crossing, saw it through the driveway between the elevator and the mill, and saw it again as it came past the elevator. The Craigs were then just started to go across the track. He saw Craig look toward the train just as he was driving upon the track.

The city marshal was standing in the creamery building, which is situated a little more than 100 feet west of the railroad track, and south of the highway, a little farther west than the mill. He heard the train whistle, saw a team coming from the mill toward the crossing. The driver seemed to be hurrying his team to get across the railway track and the crossing ahead of the train. He heard the emergency whistle and heard the bell rung.

Four assignments of error are discussed in the appellants' brief. They are: (1) That the defendants were not guilty of negligence; (2) that the deceased was guilty of contributory negligence; (3) that the court erred in rejecting evidence in support of the counterclaim for damages; and (4) that the verdict is excessive.

Defendants claim that the evidence does not warrant the inference that the speed of the train exceeded 30 miles an hour at the time of the accident, and insist that, since the statutory warnings with bell and whistle were given, even though the actual speed was 35 miles an hour, as one witness testified, this alone is not evidence of negligence. It is also said that, since trains had been running at this rate of speed at that point for over 30 years, this was the customary and usual rate, and attention is called to the fact that there was no ordinance limiting or regulating the rate of speed within the corporate limits. It is insisted that a fast rate of speed cannot of itself be negligence, citing cases, and quoting the opinion of Judge Lake in *Burlington & M. R. R. Co. v. Wendt*, 12 Neb. 76, to the effect that "speed alone, unconnected with any other fact or circumstance, and more especially where it is not shown to have been unusual, has never, that we are aware of, been held sufficient to show gross negligence." This opinion, however, also states that a rate of speed entirely reasonable at some places and under some circumstances might evince a reckless disregard for the rights of persons and property at another. The latter principle is also stated by Judge Lake in his opinion in *Meyer v. Midland P. R. Co.*, 2 Neb. 319, 335. The Nebraska cases cited in support of the theory that the rate of speed is no evidence of negli-

gence show that in each case the facts were that the trains were running in the open country outside of the limits of any city or village, and the language used applies to such conditions.

Defendant railroad also contends that, since it complied with the terms of the statute with respect to sounding the whistle and ringing the bell, it must be held free from negligence. We cannot take this view. The fact that certain precautions have been deemed necessary at all public crossings is no indication that further precautions are not demanded by the exercise of ordinary care at other places where obstructions to the view or other circumstances render a crossing more dangerous. *Ellis v. Lake Shore & M. S. R. Co.,* 138 Pa. St. 506, 21 Am. St. Rep. 914. The true principle is that a railroad company must use such care and precaution as ordinary prudence indicates. They must exercise greater care and greater vigilance in cities or towns where crossings are frequently used by large numbers of people than at ordinary crossings in the open country. The degree of care which the law requires to be exercised must be commensurate with the probability of danger. In some instances in cities and villages, ordinary care and prudence demand that gates be erected or flagmen stationed or electric bells or signals installed, while in other cases all that would be necessary would be to lessen the speed of the train, or give continuous signals of its approach, or both. *Grand Trunk R. Co. v. Ives,* 144 U. S. 408.

The jury evidently found that the defendant railroad should have better safeguarded the crossing, or that the rate of speed, considered in connection with all the other circumstances, was a negligent one. We are satisfied that the latter conclusion is upheld by the evidence. There is no proof that the deceased knew of the customary rate of speed at which this train was run at that point, and, no matter how long the practice of so running the train over this dangerous crossing had existed, it would not justify the lack of ordinary care.

97 Neb. 28

Defendant railroad next contends that the deceased was guilty of contributory negligence, and that consequently plaintiff has no right to recover. The question presented is whether, upon the undisputed evidence, it is clear that the deceased did not use ordinary care at the time and place, under all the circumstances. In this case we may start with the proposition settled and determined that the railway company was guilty of negligence in the operation of the train; but, as was said in *Chicago, B. & Q. R. Co. v. Schwanenfeldt,* 75 Neb. 80: "Individuals are required to have some regard for their own safety. Every person of mature years and in the possession of his faculties is bound to make a proper use of them to avoid danger, and we are all required to take notice of the fact that a railway crossing is a dangerous place, and he who makes use of it must exercise that degree of caution commensurate with the danger." See *Koester v. Chicago & N. W. R. Co.,* 106 Wis. 460. It is the settled rule in this court that, where upon the evidence different minds may draw different inferences or conclusions from the facts proved, or where there is a conflict in the evidence, the matter must be submitted to the jury to determine; but where there is no conflict, and but one reasonable inference can be drawn from the facts, the question is one for the court. *Guthrie v. Missouri P. R. Co.,* 51 Neb. 746, and cases cited; *Knapp v. Jones,* 50 Neb. 490.

We are of opinion that no unprejudiced mind can read the undisputed testimony without coming to the conclusion that the deceased heard the train coming, and that he rashly attempted to cross the track ahead of it. The fact that he was urging and whipping the team before he could see the train is of great importance as showing his knowledge that it was approaching. He must have seen the team driven by Behn which was waiting for the train to pass before it attempted to cross, even if he did not hear the shout. Laying aside all the testimony with reference to Craig's ability to have seen the train as he was passing north in the driveway or at the turn after the miller heard the whistle, we are fully convinced that, when he passed the witnesses to the south of the mill with his horses trot-

Craig v. Chicago, St. P., M. & O. R. Co.

ting and continued to urge them forward, he must have known of the chance that he took, and that he took the chance with knowledge of the risk. It is said that the instinct of self-preservation would prevent such action on the part of the deceased, but experience teaches that the hot blood of youth will take risks that older men will shun. The law, however, draws no distinction, unless the reckless one is of such tender age that, by reason of his lack of knowledge and experience, he cannot be chargeable with the lack of ordinary prudence. The witness for the plaintiff who saw the team come upon the track stood at a distance of over 200 feet to the east and north of the crossing, while the other witnesses were within a few feet of the team when the driver was urging them to greater speed close to the danger point. Courts are reluctant to interfere with the verdict of a jury upon questions of fact; but, where the evidence is undisputed, it becomes their duty to apply the law, and, if it clearly appears that there is no cause of action, so to declare. The principles governing are so clear that it is useless to cite authorities upon these propositions, although scores of cases may be found. We are convinced that, if the deceased had used ordinary care, he would not have been struck by the train, and that he was guilty of such negligence that there is no cause of action.

Having reached this conclusion, it is unnecessary to consider the other assignments of error. The judgment of the district court is therefore

REVERSED.

BARNES, FAWCETT and HAMER, JJ., not sitting.